KERMIT FISCHER FOUNDATION, OTIS W. BALIS, JR., TRUSTEE, AND OTIS W. BALIS, JR., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kermit Fischer Foundation v. Commissioner
Docket No. 33495-87
United States Tax Court
T.C. Memo 1990-300; 1990 Tax Ct. Memo LEXIS 318; 59 T.C.M. (CCH) 898; T.C.M. (RIA) 90300; June 18, 1990, Filed *318 Decision will be entered for the respondent. Otis W. Balis, Jr., pro se. Albert L. Sandlin, Jr., for the respondent. SWIFT, Judge. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined that petitioners were liable for excise taxes as follows: Excise Taxes, I.R.C. Secs. [1]
4940(a)
4945(a)(1)
4945(b)(1)
Kermit Fischer Foundation
for taxable years ending:
August 31, 1982
$   -
$ 4,503.30
$ 45,033.00
August 31, 1983
204.48
5,533.90
55,339.00
Excise Taxes, I.R.C Secs.
4941(a)(1)
4941(b)(1)
Otis W. Balis, Jr.
for taxable years ending:
December 31, 1981
$  390.00
$ 15,600.00
December 31, 1982
2,395.00
80,200.00
December 31, 1983
4,300.00
76,200.00 The primary issues to be decided are whether the Kermit Fischer Foundation and Otis W. Balis, Jr. engaged in certain acts of self-dealing and whether the Kermit Fisher Foundation paid unreasonable administrative expenses. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioner the Kermit Fischer Foundation ("the Foundation") *319 was located and conducted its business in Boca Raton, Florida, at the time its petition in this case was filed. Petitioner Otis W. Balis, Jr. ("petitioner" or "Balis") resided in Boca Raton, Florida, at the time his petition was filed. The Foundation was created by deed of trust on July 26, 1951, by Kermit Fischer ("Fischer") as settlor. Margaret A. Fischer, John O. Larson, and Alfred P. Hulme were the original trustees of the Foundation. The deed of trust requires that income and principal of the Foundation be paid out, at the discretion of the trustees, exclusively to religious, charitable, scientific, literary, and educational organizations. The deed of trust states Fischer's intent that the Foundation be created and administered in such a manner that gifts to the Foundation would qualify as tax deductible charitable contributions and that the Foundation's income would be exempt from income tax. The property initially contributed to the Foundation consisted of $ 1,000 in cash and 100 shares of the common stock of Fischer & Porter Company ("Fischer & Porter"), a manufacturing company located in Warminster, Pennsylvania. Kermit Fischer was the founder of Fischer & Porter. Balis *320 began working for Fischer & Porter in 1959. In November of 1969, Fischer made Balis the successor trustee of the Foundation. By that time, Balis had become a senior manager of Fischer & Porter. At the time Balis was appointed successor trustee, Fischer's will (dated May 5, 1969) provided that the residue of Fischer's personal estate, which included the majority of the Fischer & Porter class B common stock (and which represented voting control of Fischer & Porter), would be left to the Foundation. The class B common stock did not earn cash dividends and was not traded. Each share had ten votes and earned a five-percent annual stock dividend. Under the bylaws of Fischer & Porter, the class B common stock was convertible into class A common stock, at the holder's option, beginning in 1975. Fischer & Porter class A common stock had one vote per share and was traded on the American Stock Exchange. On May 11, 1971, Fischer executed a significantly revised will leaving the residue of his personal estate (including the majority interest in the Fischer & Porter class B common stock) to his son-in-law, Jay H. Tolson. Fischer died on June 6, 1971. On Fischer's death, Balis became the sole *321 trustee of the Foundation and has remained the sole trustee of the Foundation through 1988. Between 1970 and 1975, the Foundation's assets consisted entirely of Fischer & Porter class B common stock. At one point the Foundation owned as many as 21,316 shares. In 1975, Balis left the employ of Fischer & Porter. At that time, Balis' annual salary from Fischer & Porter was $ 32,282. In 1976 and 1977, Balis worked part-time as a consultant for Fischer & Porter at a fee of $ 120 per day. In April of 1975, Balis submitted all 21,316 shares of the Foundation's class B common stock to Fischer & Porter for conversion into class A common stock. These shares represented approximately four percent of the voting rights of all of the outstanding Fischer & Porter common stock. The estate of Kermit Fischer ("the estate") was the only other holder of Fischer & Porter class B common stock. Through its executor Jay H. Tolson, the estate had already submitted a large number of its class B common shares for conversion to class A stock. Under Fischer & Porter's bylaws, only a limited number of the class B common shares could be converted each year into class A common stock, and the number of shares *322 of the class B common stock that the estate had submitted for conversion would have exhausted the conversion rights available with respect to all of the class B common stock for at least three years. There was no provision in Fischer & Porter's bylaws for allocating conversion rights between shareholders. Balis protested his inability to convert any of the Foundation's class B shares into class A shares, and in August of 1975 an agreement was reached between the Foundation, the estate, and Fischer & Porter for the pro rata conversion each year of the class B shares held both by the Foundation and by the estate. From 1975 to 1983, Balis converted all but 10 shares of the Foundation's class B common stock into Fischer & Porter class A common stock. As the Foundation received the shares of class A common stock, the shares were sold by the Foundation through transactions on the American Stock Exchange. In January of 1978, Balis and his wife moved to Florida. Balis then worked as a real estate agent, became a licensed realtor, and owned and managed rental apartments. As sole trustee of the Foundation, Balis had complete control over the Foundation, and he did not routinely account for *323 the Foundation's assets or income. During the years in issue, the Foundation's assets never exceeded $ 211,268 in value. Although he became sole trustee of the Foundation on Fischer's death in 1971, Balis was paid no compensation by the Foundation until 1977. During the Foundation's fiscal years ending August 31, 1982 and August 31, 1983, Balis was paid by the Foundation $ 37,200 and $ 45,400, respectively. During Balis' calendar years 1981, 1982, and 1983, Balis received $ 33,700, [2] $ 42,100, and $ 40,100, respectively, from the Foundation. The amounts Balis received from the Foundation were paid out irregularly anywhere from two days to two weeks apart, in amounts ranging from $ 200 to $ 8,300, a pattern that suggests a correlation with Balis' personal financial needs. During the Foundation's fiscal years ending August 31, 1982 *324 and August 31, 1983, the Foundation made charitable contributions for both years in the total amount of $ 1,725. In December of 1980, Balis, on behalf of the Foundation, purchased as an investment a one-half interest in a mortgage note secured by property located in Bucks County, Pennsylvania. The Foundation purchased the interest in the note from Clement Balis, brother of petitioner Otis Balis herein. For its interest in the note, the Foundation paid Clement Balis $ 12,635. The principal on the note was due to be paid in 1984 with interest at 10.5 percent. In November of 1984, the Foundation received $ 19,168 as payment in full with respect to its interest in the note. In 1980, Balis, on behalf of the Foundation, purchased a Chevrolet El Camino truck for $ 6,400. The truck was used exclusively by Balis until it was sold for $ 5,000 in 1982. A 1980 Oldsmobile station wagon was then purchased by the Foundation for $ 4,769. The station wagon also was used exclusively by Balis until it was sold in 1985 for $ 2,500. All expenses of repair, maintenance, and fuel for these vehicles were paid by the Foundation. Total mileage driven on the vehicles increased from approximately 5,844 *325 miles in the Foundation's fiscal year ending August 31, 1982 to 8,520 miles in its fiscal year ending August 31, 1983. During 1981 through 1983, Balis, on behalf of the Foundation, rented a one-room office. In 1982, Balis, again allegedly on behalf of the Foundation, purchased an IBM PC computer for approximately $ 5,500 and paid $ 110 to take a college course on computers. In 1982, the Foundation sold a house it had purchased in 1979 and subsequently improved. Balis had purchased the house located in Delray Beach, Florida, for $ 63,000 as an investment for the Foundation. Balis apparently acted as real estate agent for the Foundation in connection with the purchase and was paid a commission of $ 1,134. Balis, on behalf of the Foundation, then spent an additional $ 59,220 on the house for repairs, renovations, landscaping, and additions. Balis acted as the general contractor, supervising the people hired to perform the work, which included installation of an in-ground swimming pool. Work on the house was completed in 1980, and it was immediately listed for sale. As indicated, however, the house was not sold until July of 1982. The sales price was $ 134,000, of which the Foundation *326 received $ 28,878 in cash and a mortgage for $ 94,000. The mortgage was for approximately six years at 12-percent interest, with principal payments due annually, and a balloon payment of $ 64,000 due in 1988. The mortgage was paid off on April 7, 1986. Balis acted as real estate agent for the Foundation on the sale of the house, for which he was paid a commission of $ 1,347. In 1981, Balis was employed part-time by the Elizabeth H. Faulk Foundation Inc. ("the Faulk Foundation") as administrator of the Center for Group Counseling, for which he earned a salary of $ 10,000 per year. In March of 1982, Balis resigned from that position, but he remained on the board of trustees of the Faulk Foundation. In 1984, Balis was hired on a full-time basis as executive director of the Faulk Foundation. He continued to hold that position through 1988 when his annual salary from the Faulk Foundation was $ 41,250. Balis caused the Foundation to file Form 990-PF (Returns of Private Foundation) for its fiscal years ending August 31, 1982 and August 31, 1983. The Foundation did not treat Balis as an employee. No Forms 1099 were filed until respondent's examining agent requested Balis to do so. *327 Balis then filed delinquent Forms 1099 on behalf of the Foundation for the years 1981, 1982, and 1983. In separate notices of deficiency both dated July 20, 1987, respondent determined petitioner's and the Foundation's liability for the excise taxes shown above. Also by notice dated July 20, 1987, respondent revoked the Foundation's exempt status under section 501(c)(3), effective September 1, 1987. The revocation was based on a determination that since September 1, 1981, the Foundation's earnings had inured to the private benefit of Balis in the form of unreasonable compensation, excessive reimbursement of expenses, and the furnishing of automobiles for his personal use. Respondent's expert witness, Herbert L. Kurras, testified and submitted a report regarding the usual and customary compensation paid to trustees of private foundations during the years at issue. He stated that most foundations use a formula to determine annual compensation of their trustees of $ 4 to $ 5 per $ 1,000 of foundation assets plus 5 percent of foundation income. In the case of the Kermit Fischer Foundation, application of this formula would result in a range of from $ 1,450 to $ 2,000 for Balis' compensation *328 as trustee during the years at issue. As of the date of trial, the Foundation had made no attempt to correct the taxable expenditures determined by respondent within the meaning of section 4945(b)(1). Also, as of the date of trial, Balis had made no attempt within the provisions of section 4941(b)(1) to correct the acts of self-dealing as determined by respondent. OPINION Section 4941
Under section 4941, acts of self-dealing between private foundations and disqualified persons are subject to a first tier tax of five percent of the amount involved in the acts of self-dealing. Liability for the tax falls on the disqualified persons. The amount involved is defined, in a situation involving compensation for services, as that portion of the compensation that is determined to be excessive. Sec. 4941(e)(2). Acts of self-dealing are defined in section 4941(d) to include, among other things, the payment of compensation to disqualified persons unless the compensation represents payment for personal services that are reasonable and necessary to carry out the exempt purposes of the foundation and unless the compensation paid for the services is not excessive. Sec. 4941(d)(1)(D) and (2)(E). *329 The purpose of section 4941(d) is "to clarify what acts would be considered acts of self-dealing and to minimize the need to use subjective standards in evaluating potential acts of self-dealing." Estate of Reis v. Commissioner, 87 T.C. 1016, 1023 (1986). The compensation paid must be reasonable under all the circumstances. Generally, the compensation will be regarded as reasonable if it reflects amounts that ordinarily would be paid for like services by like enterprises under like circumstances. Sec. 53.4941(d)-3(c)(1), Foundation Excise Tax Regs., and Sec. 1.162-7, Income Tax Regs.
Disqualified persons are defined to include foundation managers and trustees of a foundation. Sec. 4946(a)(1)(B) and (b)(1). Liability for the self-dealing excise taxes arises regardless of whether the disqualified persons are aware at the time of the acts that they participated in acts of self-dealing within the meaning of section 4941(a)(1). If acts of self-dealing are not corrected within the taxable period, a second tier tax of 200 percent of the amount involved is imposed on the disqualified persons. Sec. 4941(b)(1). The taxable period starts on the date the acts of self-dealing are deemed to *330 have occurred and ends on the earliest of: 1) The date of mailing of a notice of deficiency; 2) the date on which the tax imposed by section 4941(a)(1) is assessed; or 3) the date on which a correction is completed. If respondent's tax determination is contested in court, however, the second tier tax is not to be assessed until the judgment of the court becomes final. If correction is made any time before the judgment of the court becomes final, the second tier tax is not to be assessed. Secs. 53.4961-1 and 53.4961-2(e), Foundation Excise Tax Regs. A correction is defined as undoing the acts of self-dealing to the extent possible (i.e., placing the foundation in a financial position not worse than it would have been in had the disqualified persons acted under the highest fiduciary standards). Sec. 4941(e)(3); sec. 53.4941(e)-1(c)(1), Foundation Excise Tax Regs. Respondent contends that no more than $ 2,000 per year should be regarded as reasonable and customary compensation to Balis for his services as trustee of the Foundation. Respondent argues therefore that payments of compensation to Balis by the Foundation of amounts in excess of $ 2,000 during each of the years 1981, 1982, *331 and 1983 constitute excessive compensation and acts of self-dealing under section 4941. Balis contends that his compensation was not excessive considering the services he rendered to the Foundation, all of which he claims were reasonable and necessary to the Foundation's exempt purposes. Balis points out that he earned far less than managers of other foundations. He also implies that his compensation could not have been excessive because it was approximately what he had been receiving from his previous employment and what he went on to earn in subsequent jobs. Petitioners' arguments are not persuasive. Balis kept no records of how much he was compensated by the Foundation for specific services performed, and he did not explain why the payments of "compensation" that the Foundation made to him were made sporadically in widely differing amounts (except to allege that he received payments when the Foundation could afford it). The other foundations to which petitioner makes reference have assets in the millions of dollars and are not comparable. We note that the Foundation paid Balis nothing for his services from the time he became sole trustee in 1971 until 1977, the year he severed *332 his relationship with Fischer & Porter. In early 1978, he moved to Florida and eventually took up several part-time jobs. Although Balis appears to argue that some of the compensation paid him during the years at issue was back pay for the years prior to 1977, we find this argument unpersuasive as it is wholly undocumented and nonspecific. We cannot ignore the fact that Balis' compensation from the Foundation appeared to increase in relation to his own personal needs, and that it was paid out in irregular amounts that strongly suggest that he paid himself whatever was needed for his personal living expenses. Balis himself bolsters this conclusion by seeming to equate his customary level of earnings with reasonable compensation from the Foundation. While it is true that Balis rendered reasonable and necessary services to the Foundation such as preparing the Forms 990-PF, arranging for the conversion and sale of Fischer & Porter stock, and investing some of the Foundation's funds, these actions were within the normal scope of his duties as trustee and do not justify compensation above the $ 2,000 limit persuasively attested to by respondent's expert witness. With regard to other duties *333 allegedly performed by Balis (e.g., acting as general contractor on the renovation of the Delray Beach house) Balis does appear to have performed a substantial amount of work that was necessary. However, Balis failed to document the amount of time he spent, the value of the services he rendered, and the amount of his compensation from the Foundation that is attributable to such services. In addition, almost all of the work on the Delray Beach house (except for some upkeep while the house was on the market) was done before the years in issue. Balis offered no rebuttal testimony or evidence regarding the standards for reasonable or customary compensation of private foundation trustees. Finally, the incredibly small percentage of money actually donated to charity by the Foundation supports our finding as to the excessiveness of Balis' compensation. During the Foundation's two fiscal years ended August 31, 1982 and 1983, the Foundation paid cash compensation to Balis of over 47 times the amount donated to charity. We conclude that $ 2,000 per year (for the years before us) represented reasonable compensation from the Foundation to Balis for services of Balis that were reasonable and *334 necessary to the Foundation's exempt purposes. We hold that all payments of "compensation" by the Foundation to Balis in excess of $ 2,000 per year constituted acts of self-dealing, and that Balis is liable for the excise taxes determined under section 4941. Section 4945
Under section 4945, private foundations that make taxable expenditures must pay a first tier tax of 10 percent of each taxable expenditure. Taxable expenditures are defined, inter alia, as amounts paid or incurred for purposes other than those specified in section 170(c)(2)(B). Section 170(c)(2)(B) lists the following purposes: Religious, charitable, scientific, literary, educational, or to foster national or international amateur sports competition, or for the prevention of cruelty to children or animals. As further explained in section 53.4945-6(a), Foundation Excise Tax Regs., taxable expenditures include expenditures for activities which, if they were a substantial part of the foundation's activities, would cause the foundation to lose its tax-exempt status. Under section 53.4945-6(b)(2), Foundation Excise Tax Regs., expenditures for unreasonable administrative expenses, including excessive compensation, are *335 considered taxable expenditures unless the foundation demonstrates that such expenditures were paid in the good faith belief that they were reasonable and that payment of such expenditures was consistent with ordinary care and prudence under all the relevant facts and circumstances. If taxable expenditures are not corrected within the taxable period, a second tier tax of 100 percent of the amount of the taxable expenditures is imposed on the foundation. Sec. 4945(b)(1). The taxable period starts on the date the taxable expenditures are deemed to have occurred and ends on the earlier of: 1) The date of mailing of a notice of deficiency; or 2) the date on which the tax imposed by section 4945(a)(1) is assessed. If the tax is contested in court, the second tier tax is not to be assessed until the judgment of the court becomes final. If correction is made any time before the judgment of the court becomes final, the second tier tax is not to be assessed. Secs. 53.4961-1 and 53.4961-2(e), Foundation Excise Tax Regs. However, even if a correction is made in time to avoid liability for the second tier taxes, the taxpayer will not be relieved of liability for the first tier taxes. As *336 we stated in German Society of Maryland, Inc. v. Commissioner, 80 T.C. 741, 745 (1983), "the initial tax is a spur designed to remind the foundation that it has been remiss. Subsequent compliance with the rules enables the foundation to avoid the real whip of section 4945(b)(1), but cannot undo the punishment for its initial infraction." A correction is defined as recovering all or a part of the expenditures, or, to the extent recovery is not possible, such corrective action as shall be prescribed by the Secretary. Sec. 4945(i)(1). Respondent has authority to require other measures on a case-by-case basis. Sec. 53.4945-1(d)(1), Foundation Excise Tax Regs. Respondent contends that the Foundation made the following taxable expenditures: Expenditure
Fiscal Year Ended
August 31, 1982
August 31, 1983
Compensation to Balis
(in excess of $ 2,000)
$ 35,200
$ 43,400
First Auto Expense
1,154
2,449
Office Expense
3,254
4,721
Computer Purchase
5,425
--
Second Auto Expense
--
4,769
Total
$ 45,033
$ 55,339 The Foundation has the burden of proof with respect to expenditures determined by respondent to be excessive under section 4945(a)(1). Rule 142(a). Petitioner contends generally that the Foundation's expenditures *337 were reasonable to achieve the purpose of investing the assets of the Foundation. While it is true that as trustee Balis had authority to invest the Foundation's assets, it is clear that rental of office space, providing automobiles, and many of the other expenses incurred by Balis on behalf of the Foundation were not necessary to the operations and investments of the Foundation. Balis fails to acknowledge that the explicit purpose of the Foundation was simply to donate its earnings and principal to charitable causes. Balis refers repeatedly to his thwarted early expectation that the Foundation would inherit the controlling interest in Fischer & Porter rather than a minority interest therein. While we understand Balis' disappointment with the reduced charitable legacy the Foundation received (and therefore over which he had control as sole trustee of the Foundation), we do not believe such disappointment excuses Balis' actions or his apparent inability to acknowledge the actual size of the Foundation when he became sole trustee. Balis could not have been ignorant of the fact that his actions were rapidly draining the Foundation's assets, and that the intended charitable beneficiaries *338 of the Foundation were receiving only a small portion of its funds. The Foundation has failed to carry its burden of proof. As stated above, the compensation paid to Balis was excessive and therefore is considered a taxable expenditure under section 4945. We are not persuaded that Balis, on behalf of the Foundation, expended the above sums on automobiles, office space, and equipment for the good faith administration of the Foundation. We hold the Foundation liable for the excise taxes determined under section 4945. [3]
Section 4940
Under section 4940, private foundations that are exempt from taxation under section 501(a) are subject to a tax equal to two percent of their net investment income in any taxable year. Net investment income is defined as the amount by which the sum of gross investment income and net capital gains exceeds allowable deductions. The allowable deductions are ordinary and necessary expenses for the production or collection of gross investment income or for *339 the management, conservation, or maintenance of property held for the production of such income, with certain modifications not relevant here. Sec. 4940(c)(3)(A). Congress enacted the excise tax on net investment income of private foundations because it was "concerned that many private foundations were not fulfilling the charitable purposes for which they were granted exemption from income tax." Lettie Pate Whitehead Foundation, Inc. v. United States, 606 F.2d 534, 537 (5th Cir. 1979). Respondent contends that for the fiscal year ended August 31, 1983, the Foundation had net investment income of $ 10,224. This results from disallowance by respondent of $ 31,394 of claimed deductions that respondent contends were not for ordinary and necessary expenses paid or incurred for the production of income. The items disallowed in whole or in part by respondent include trustee compensation, depreciation on office equipment and automobiles, office rent, state sales tax on automobile purchase, and miscellaneous office expenses. For the purpose of computing section 4940 excise taxes, only investment- related expenses are deductible. Expenses must be allocated between activities relating to *340 charitable distributions (i.e., exempt functions) and investment-related income-producing activities. Julia R. and Estelle L. Foundation v. Commissioner, 70 T.C. 1, 11 (1978), affd. 598 F.2d 755 (2d Cir. 1979). Respondent apparently has allocated 50 percent of certain expenses to the Foundation's exempt function, and allocated the remaining 50 percent to investment-related activities. The Foundation has failed to offer any specific evidence or argument concerning this issue and therefore fails to carry its burden of proving that respondent's contentions are in error. Petitioner, on behalf of the Foundation, cannot simply rely on a general assertion that his actions were proper and that respondent has failed to show a specific record-keeping requirement. We hold the Foundation liable for the excise taxes determined under section 4940. Decision will be entered for the respondent. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Only $ 7,800 of this amount is included in the notice of deficiency, reflecting amounts paid during the period from September 1 through December 31, 1981. The statute of limitations expired before issuance of the notice of deficiency with regard to the balance of $ 25,900, which was paid to Balis during the period January 1 through August 31, 1981.↩
3. As indicated, petitioners may avoid liability for the second-tier taxes herein sustained under sections 4941 and 4945 if they make a correction before the decision of this Court in this case becomes final.↩